### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALLEN L. WISDOM,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 15-1821 (JEB)** |
| **UNITED STATES TRUSTEE PROGRAM,** | |
| **Defendant.** | |

### MEMORANDUM OPINION

As Michael Scott was admonished on *The Office*, there is a lot more to bankruptcy than just "declaring" it loudly to coworkers. Plaintiff Allen Wisdom knows this fact all too well. He has been going through a bankruptcy proceeding before a federal court in Idaho since 2011. At the outset of that action, the United States Trustee appointed Jeremy Gugino to act as the private trustee on his case. Wisdom and Gugino, however, quickly arrived at loggerheads, and, by the close of 2013, the former had filed an adversary proceeding against the latter, who then resigned from his post.

At issue in the present case are Freedom of Information Act requests that Wisdom subsequently lodged with Defendant United States Trustee Program to acquire information related to his bankruptcy proceeding and Gugino's service as a trustee. Having been unsuccessful in obtaining the material he sought, Wisdom brought this *pro se* action, in which both sides now move for summary judgment. The Court concludes that an issue of material fact exists as to whether Defendant conducted adequate searches in response to these requests and properly relied on the exemptions cited to justify most of its withholdings. The Court will, therefore, largely deny both Motions.

1

## I.  Background

To understand the present competing Motions requires a lengthy back story, which sets forth the protracted back-and-forth between Wisdom and the Agency over the scope and processing of the FOIA requests at issue.   After the Court briefly outlines the general agency structure and the facts that gave rise to Wisdom's desire for these records, the subsequent sections march through this procedural background as it pertains to each of his inquiries.   A final section rounds out the retelling with the particulars of what has occurred since suit was filed.

### A.  General Agency Structure

The United States Trustee Program, housed within the Department of Justice, oversees the administration of bankruptcy cases and private trustees.  See ECF No. 14 (Motion) at 3. Sitting atop its structure, the Executive Office for the United States Trustees (EOUST) provides general policy and legal guidance to trustees and handles the Program's administrative functions, including responding to FOIA requests.  Id. at 4.  EOUST, in furtherance of these duties, also promulgates administrative procedures for the suspension and removal of bankruptcy trustees. See 28 C.F.R. § 58.6.

Moving down the pyramid, a United States Trustee is appointed by the Attorney General for each federal judicial district in the country.  See 28 U.S.C. § 581(a).  This Trustee, in turn, establishes, maintains, and supervises the panel of private trustees who administer Chapter 7 bankruptcies in those districts.  See Mot. at 4.  The Trustee for Region 18 works out of the Regional Office in Seattle and oversees the judicial district of Idaho (among others).

### B.  Bankruptcy Proceeding

On July 12, 2007, the Region 18 Trustee appointed Jeremy Gugino to serve as a private trustee on its panel.  Id. at 5-6 & Exh. R.

Around four years later, Wisdom filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Idaho. Id. at 6. The Trustee, accordingly, appointed Gugino to his case. Id. at 6. The two men, however, did not work well together, and, in December 2013, Plaintiff filed an adversary proceeding in the bankruptcy court against Gugino, alleging that the trustee had engaged in various forms of misconduct in handling his case. See ECF No. 18 (Cross-Motion) at 6.

Shortly thereafter, on December 31, 2013, Gugino resigned from his position as a member of the region's private-trustee panel. See Mot. at 6 & Exh. R.

C.   FOIA Request 2015-2053

On March 19, 2015, over a year later, Plaintiff submitted a FOIA request to EOUST for 15 categories of records that related either to his bankruptcy proceeding or to Gugino's service as a trustee. See ECF No. 14-1 (Declaration of Joseph Carilli), ¶ 6. The request stated that it "pertain[ed] only to records located at the Office of the United States Trustee, District of Idaho" and declared that Wisdom was willing to pay up to $450 in attendant processing fees. See id., Exh. A at 2, 4. That very same day, EOUST sent him a letter explaining that his "complex" request had been assigned tracking number 2015-2053. Id., Exh. B.

A week later, the agency followed up with a longer letter, this time asking Wisdom to provide more details on what he was seeking to help it "accurately estimate all applicable fees for search, review, and/or duplication of [the] requested records." Id., Exh. C. at 1. Defendant further explained that, due to privacy concerns, "most if not all of the [requested] records relating to [Gugino's] trustee performance evaluations [we]re likely to be withheld in part or in full under FOIA exemptions." Id. The letter nevertheless informed Wisdom that he would be responsible for fees related to processing these records unless he chose to narrow his inquiry's scope. Id. at

1-2.  The agency, finally, requested that Wisdom confirm that his request was limited only to records located at the Boise office and, in a footnote, explained that many of the requested documents would likely be held at EOUST here in Washington, D.C.  Id. at 2.

Plaintiff quickly responded.  Id., Exh. D.  In his own letter, on April 9, 2015, Wisdom declined to narrow the scope of his request and disagreed with the agency's prediction that certain documents would ultimately be exempt from disclosure.  Id. at 1-2.  Wisdom also confirmed that his request focused only on records located at the Boise office, but, in his own footnote, indicated that it did so because certain regulations indicated that the documents he was requesting are "initiated and/or generated by the District of Idaho."  Id. at 3 & n.15.  He then hedged, saying, "If for some reason, unknown to me, records requested were either initiated by or generated by the Boise, Idaho office but are actually located elsewhere then the request for the records would be for wherever located."  Id.

A month later, EOUST responded that it now understood the scope of 2015-2053 to include "all records of any nature contained in [Gugino's] oversight file . . . whether maintained in Boise, Idaho or other [USTP] offices."  Id., Exh. E.  To speed his recovery of the Boise documents, however, EOUST recommended that Wisdom agree to a two-stage "rolling release protocol."  Id. at 4.  The agency, under this plan, would first search for and release records found in the Boise office for his review; if he wished to proceed with more records, only then would the agency go to a stage-two search of the other offices.  Id.  EOUST concluded that this "two-stage method" would best enable Wisdom "to make a more informed decision as to whether [he] wish[ed] to narrow the scope of [his] search to just those records obtained from the Boise, Idaho office" at a later date.  Id.  The agency estimated as well that the fees for the request would fall around $224.50 – well below Wisdom's previous commitment to pay up to $450.  Id. at 3.  It

4

nevertheless asked him to please "let [the agency] know whether this is acceptable" and to provide pre-payment of these fees by June 8, 2015. Id. at 4.

Wisdom adequately complied, agreeing on May 11 that the agency's "consolidated review of [his] request [wa]s accurate" and indicating that he "d[id] not object to the 'rolling release' protocol." Id., Exh. F. He also attached a check for the advance fee. Id. at 2.

All cylinders seemed set to fire, then, but once the agency began the search, it discovered that the archiving of certain trustee reports had been done by date, rather than by trustee. Id., Exh. G. EOUST thus reached out to Wisdom a week later to inform him that it would now take significantly longer than the agency had originally estimated to weed out the reports related to Gugino. Id. Defendant also noted that the Boise office had confirmed to EOUST in the meantime that some responsive reports were consolidated in the Region 18 Office with reports from other federal districts, meaning that at least some of the requested documents would not be located at the Boise office after all. Id.

Wisdom responded to clarify that he was not seeking some of the difficult-to-sift reports and to ask for an explanation of why relevant records might be located outside the Boise office despite certain regulations to the contrary. Id. The parties worked out these issues over the next few days in a further exchange of emails, and things again seemed to be on track for a reasonably timely completion of the searches. Id., Exh. H.

EOUST, indeed, thereafter proceeded to search for the documents and initially returned Gugino's check for $224.50 to him on the ground that it did not require advance payment for searches that were projected to cost less than $250. Id., Exh. I. By July 23, 2015, however, the agency's stage-one search of the Boise office had already totaled 16.75 hours, thus yielding a fee of $411.25. Id., Exh. J at 2. The agency sent Wisdom another letter requesting that he now

remit that amount by August 24, 2015, or it would close the processing of his request. Id.
Wisdom timely sent in the requested amount again, although the government had still not turned
over any records. Id., Exh. K.

 Nearly a month later, in fact, Wisdom had still heard nothing from the agency about the
documents he had requested. Frustrated that he had yet to see a single record, Plaintiff sent
another email to Defendant, asking it to let him know when his request, now pending for 167
days, would be completed, "at least" as to the first part. Id., Exh. L. EOUST responded the next
day that it anticipated a partial release later that month. Id., Exh. M.

 The agency, however, again failed to produce anything on its proffered timeline. Well
over a month later, on October 8, Wisdom thus inquired anew about the status of his request. Id.,
Exh. N. He reiterated his previous complaint that the agency's delay in producing records was in
serious breach of the "statutory time requirement in which to comply with release of the
requested documents" and asked that it either provide a reasoned basis for its refusal to give him
the documents or fast-track their release. Id.

 The very next day, EOUST sent Wisdom a partial stage-one batch of documents. Id.,
Exh. O. This initial release contained 58 pages "subject to redactions pursuant to FOIA
Exemptions (b)(5) and/or (b)(6)." Id. at 2. Over two months later, the agency sent a second
stage-one crop of 111 pages, again subject to redactions under various FOIA exemptions. Id.,
Exh. P. Two months later, on February 2, 2016, the agency sent a third – which it described as a
"final" – release of redacted records from its search of the Boise office. Id., Exh. Q.

 In a footnote accompanying this final set of documents, the agency indicated that "for
administrative purposes only" it would consider these stage-one releases – i.e., the first half of
his "bifurcated" 2015-2053 request – as the entirety of his FOIA request, but, should he "wish to

pursue the second part of [his] request," it would prioritize that search under a new case number as though it had been received on March 19, 2015. Id. at 1 n.2. The agency further indicated that it would apply the same fee rates to this stage-two search if he elected to proceed with it. Id. at 2-3. By this time, nearly a full calendar year had passed since Wisdom first submitted his 2015-2053 request and, as discussed below, this case had already been filed.

D. FOIA Request 2016-2003

Four days after the first 2015-2053 release, Wisdom submitted on October 13, 2015, another FOIA request to the Agency for any records related to the processing of his 2015-2053 request. Id., Exh. S. He did so based on his belief that someone within the agency was obstructing his access to the documents he had requested. See ECF No. 18-1 (Declaration of Allen L. Wisdom), ¶ 26. In particular, he felt that the agency's vacillations on the location of the records, the applicable exemptions, and the fees associated with the search might indicate interference with his efforts to acquire more information about Gugino's service as a trustee. Id., ¶¶ 26, 28. The agency wrote back two days later, designating this new FOIA request as 2016-2003 and, as before, classifying it as complex. See Mot., Exh. T.

Several months went by before the agency followed up with a call to Wisdom to discuss his new inquiry's scope. Id., Exh. U. This conversation was immediately memorialized in an email from EOUST to Wisdom on January 15, 2016, for the express purpose of "confirm[ing] what we discussed and to ensure that [the agency] had described accurately how [Wisdom] wish[ed] to narrow [his request's] scope." Id. In sum, EOUST would search for: "1) all administrative processing notes in the Idaho office; and 2) any correspondence between the Idaho office and the EO about FOIA 2015-2053 regarding the documents themselves; and 3) any email or other correspondence such as reports showing the procedures EO staff employed in

processing the record as received from Idaho." Id. at 2.  The search, however, would exclude "[Executive Office]-only, internal records discussing solely the application of exemptions" and "correspondence relating to communications with Assistant United States Attorney Fred Haynes regarding" this lawsuit (discussed below) over the agency's actions in regard to request 2015-2053. Id. at 2.  A day later, Wisdom wrote back confirming this description was "quite accurate." Id. at 1.

Plaintiff and the agency also negotiated a further narrowing of this request on February 23, 2016, again documenting their agreement in an email that Wisdom confirmed to be accurate. Id., Exh. V.  This time they agreed that the agency would look for "[a]ny conversations between any employee of the UST program located in the Boise, Idaho field office and a third party, regarding your 2015-2053 FOIA request." Id.

A day later, EOUST confirmed that "[a]fter a reasonable search by the Boise, Idaho office of their agency records, no records were located that appear to meet your request for information." Id., Exh. W.  In other words, the agency released no documents pursuant to this second request, 2016-2003.

E.  FOIA Request 2016-2033

On February 23 – i.e., the same day that the parties communicated about narrowing his 2016-2003 FOIA request – Wisdom confirmed that he did "wish to go forward with the second phase [of 2015-2053] and obtain documents from the other than [sic] Idaho UST offices." ECF No. 24 (Opposition to MSJ), Suppl. Exh. B.  Over the next few days, the agency thus wrote two follow-up emails to Wisdom, referring to his stage-two request as a "new" FOIA case and designating it a tracking number of 2016-2033. Id., Suppl. Exh. C.

Wisdom immediately objected to the agency's characterizations of this as a "new" inquiry via his own letter on February 26, specifically complaining that its "unilateral[] re-designat[ion]" of his request was unjustified when it was simply the previously agreed-upon second stage of 2015-2053. Id., Suppl. Exh. D. To support his position, Wisdom quoted from previous letters exchanged between himself and the agency about the expediency benefits of a rolling two-stage process. Id. He noted, in particular, that the language in these communications of a "second stage" hardly implied the agency would consider the search to be an entirely "new" request at some future point. Id. A few days later, the agency responded by insisting that his request was indeed "new," though it also nevertheless continued to refer to it as the second part of his "bifurcated" 2015-2053 request. Id., Suppl. Exh. E.

On March 7, 2016, Defendant completed its search of other USTP offices for responsive records and notified Wisdom via email that it estimated a review of the discovered documents would cost him around $567.53 in pre-paid fees. Id., Suppl. Exh. G at 3. Within days, Wisdom sent in the payment, and the parties worked out the exclusion of some potentially responsive documents in an effort to reduce unnecessary or duplicative costs. Id., Suppl. Exhs. F & G.

On March 18, the agency sent Plaintiff 209 pages of redacted documents pursuant to this final request. Id., Suppl. Exh. I.

F.   Procedural History

On October 23, 2015, shortly after the agency's first 2015-2053 release and Wisdom's submission of request 2016-2003 (the one related to the processing of his first request), he filed the current action. See ECF No. 1 (Complaint). In his initial Complaint, Wisdom alleged that USTP had unlawfully withheld and redacted documents relevant to his 2015-2053 request and

initiated a multi-stage "rolling release" schedule that violated their mutual agreement to timely turn over the documents in just two stages. Id., ¶¶ 23-27.

A little more than a month later, on November 30, Wisdom amended his Complaint to reflect the agency's continued failure to produce further documents or to make a final determination on his 2015-2053 request. See ECF No. 2 (Amended Complaint). He also added a new claim to challenge the agency's tardy response to his 2016-2003 request, noting that he had heard nothing from the agency in over twenty days since it had first assigned that inquiry a tracking number. Id., ¶¶ 28-35. In short, Wisdom effectively expanded the scope of this action to include the agency's failure to produce documents for both 2015-2053 and 2016-2003 within the applicable statutory timeframes provided by FOIA, as Defendant had turned over just one partial release of 2015-2053 documents at that point.

After Defendant's Answer, the Court set a briefing schedule, and the agency made the subsequent additional releases discussed above. The parties' Cross-Motions for summary judgment are now ripe.

## II.   Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006). Factual assertions in the

moving party's affidavits or declarations may be accepted as true unless the opposing party submits his own affidavits, declarations, or documentary evidence to the contrary. Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Defenders of Wildlife v. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007). In FOIA cases, the agency bears the ultimate burden of proof. See Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 n.3 (1989). The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

## III.    Analysis

Congress enacted FOIA in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of the Air Force v. Rose, 425 U.S. 352, 361 (1976) (quotation marks and citation omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted). The statute thus provides that "each

agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).  Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds.  See id. § 552(a)(4)(B); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 754-55 (1989).  In making this determination, the court "at all times . . . must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'"  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).  Thus, in order to satisfy FOIA, an agency must demonstrate both that it adequately searched for responsive records and that it turned over all such records not subject to a specific exemption.

As mentioned above, the parties have now cross-moved for summary judgment.  Before addressing the merits of these Motions, the Court first takes up Defendant's contention that what the agency designated as request 2016-2033 should not be considered here because Wisdom did not first administratively appeal that particular determination.  The sections that follow then address, respectively, whether the agency's supportive declarations comport with the Federal Rules of Civil Procedure, the adequacy of its three searches for responsive records, its reliance on specific exemptions to justify its attendant redactions, and, finally, its compliance with FOIA's segregability requirements.  At the end of the day, the Court determines that, for the most part, USTP has not sufficiently discharged its duty.

A.  Exhaustion

Before diving into the merits of these Cross-Motions, the Court must first consider a threshold issue that could narrow the scope of that review.  In its Opposition, Defendant briefly asserts that Plaintiff's challenge to the 2016-2033 release – i.e., 2015-2053 documents that were

located outside its Boise office – has no purchase here because Wisdom did not exhaust his administrative remedies by appealing that particular determination through the agency's procedures first. See Opp. at 15-16. In support, the agency summarily states that it properly classified 2016-2033 under a distinct tracking number when Wisdom informed it that he wished to proceed with 2015-2053's second stage in February 2016. Id. at 15. Because Defendant also later notified him, when it released responsive records in March 2016, that he had a right to appeal that determination, the agency contends that his failure to pursue such relief means he "technically" failed to exhaust his remedies as to those records. Id. at 16.

Administrative exhaustion of a FOIA request is, as the agency argues, "generally required before filing suit in federal court." Hidalgo v. FBI, 344 F.3d 1256, 1258 (D.C. Cir. 2003) (citing Oglesby v. Dep't of the Army, 920 F.2d 57, 61 (D.C. Cir. 1990)) (exhaustion requirement gives agency opportunity to exercise discretion and expertise and develop factual record to support its decision). This requirement, however, is not jurisdictional and, as a result, is subject to exceptions. Id. A plaintiff, in particular, need not administratively appeal an agency's FOIA determination where he has waited the time specified by statute for a final response and, having received none, files suit in district court. Oglesby, 920 F.2d at 63-64. In that situation, the Court deems the requester to have "constructively" exhausted his administrative remedies and allows him to seek immediate relief "to compel the agency's response." Id.; see also Nurse v. Sec'y of the Air Force, 231 F. Supp. 2d 323, 328 (D.D.C. 2002). "Once constructive exhaustion occurs, [moreover,] any available administrative appeal – *i.e.*, actual exhaustion – becomes permissive in the sense in which the term is used here; the requester may pursue it, but his failure to do so does not bar a lawsuit." Spannaus v. United States Dep't of Justice, 824 F.2d 52, 58 (D.C. Cir. 1987).

Wisdom met these constructive-exhaustion requirements here. To begin, Defendant does not argue that he has not exhausted his claims with regard to his 2015-2053 request; it only believes that 2016-2033 should be treated separately. Yet, if, as Plaintiff maintains, his 2016-2033 request is merely a component of 2015-2053, then he must have exhausted that as well. Whether this is true is thus the question the Court must decide first.

Constructive exhaustion is determined by the actions (or lack thereof) an agency has taken by the time a suit is filed in the district court. See Oglesby, 920 F.2d at 64. As explained above, when Wisdom filed in October 2015, long after the statutory timeframe for an agency determination had passed for request 2015-2053, the requirement that he must first pursue an administrative appeal with regard to that inquiry became permissive. Spannaus, 824 F.2d at 58. At that point in time, moreover, both parties plainly considered the non-Boise documents to be part and parcel of 2015-2053. See Mot., Exh. E (acknowledging 2015-2053 to include "all records of any nature contained in [Gugino's] oversight file . . . whether maintained in Boise, Idaho or other USTP offices") (emphasis added); see also Exhs. J, O (referring to "the search" rather than "searches" in referencing documents held both inside and outside Boise office). Defendant, in fact, never indicated that it would consider a search of other offices as an entirely new request until four months after Wisdom filed this case. Id., Exh. Q.

The agency's unilateral and tardy reclassification, taken over Plaintiff's active protests, cannot strip Wisdom of his right to judicial review of an already-pending claim. The purpose of FOIA's exhaustion requirement is not to trick an unsuspecting requestor into relinquishing his right to his day in court, but rather to allow the agency an "opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision." Oglesby, 920 F.2d at 61. To preserve these legitimate ends, the agency easily could have sought Wisdom's

14

agreement to treat the second part of his bifurcated case as an entirely new request when it proposed its two-stage search method. It did not do so. See Mot., Exh. E. In such a case, Wisdom might well have refused to go along with such a plan, as he was clearly hoping to get the documents within something akin to the speedy timeframe required by the FOIA statute.

The agency's subsequent actions, moreover, also bar an exhaustion defense here. As discussed above, when it created the 2016-2033 designation for these records in February 2016, Defendant assured Wisdom that this change would <u>not</u> alter his rights. <u>Id.</u>, Exh. Q at 1 & n.2. In fact, it promised him that the classification would be used solely for its own administrative purposes and the request would still be prioritized as though it had been received a year earlier. <u>Id.</u> Given that this case was already pending by this time, an accomplished tea-leaves reader would have been hard-pressed to divine that Defendant intended to retroactively shield from imminent judicial review this final, outstanding portion of its tardy 2015-2053 determination. Finally, when a defendant has made these particular representations, which reasonably would have deterred a plaintiff from seeking administrative redress within FOIA's attendant deadlines for an administrative appeal, the core purposes of FOIA's exhaustion regime would not be advanced by allowing the agency to thus avoid judicial review entirely.

On the specific facts of this case, therefore, the agency has failed to show it has a viable exhaustion defense to any of Wisdom's claims. See Hidalgo, 344 F.3d at 1258-59 (explaining FOIA exhaustion is a jurisprudential doctrine precluding review if "the purposes of exhaustion" and the "particular administrative scheme" support such a bar). The Court, accordingly, will address all of Plaintiff's challenges to the agency's responses in the sections that follow.

B.  Carilli  Declarations

As mentioned  above, in the FOIA context, the agency bears the burden to demonstrate that it has conducted a reasonable search and that a claimed exemption  applies to any record that it subsequently withholds.  Citizens for Responsibility  & Ethics in Wash. v. Dep't of Justice, 746 F.3d 1082, 1088 (D.C. Cir. 2014).  It may carry these burdens by submitting  affidavits with "reasonably  specific detail" that outline  its actions and justifications,  and that "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  Id. (quoting  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)); see also Oglesby, 920 F.2d at 68 (same for search).

In accord with this practice, USTP relies on two such Declarations from Joseph Carilli,  a trial attorney in EOUST who has been responsible  for its FOIA compliance  efforts since February 4, 2016.  See Carilli  Decl., ¶ 1. Wisdom  maintains,  however,  that the agency cannot rely on these particular  Declarations because they violate  Federal Rule of Civil  Procedure Rule 56(c)(4)'s requirement  that a declaration be made based upon "personal knowledge."  See Cross-Mot. at 13.  Carilli  cannot possibly  have such knowledge  about the search and applicable exemptions,  Plaintiff  asserts, as he did not take over these duties for the agency until  well after those tasks were largely completed for the FOIA requests at issue here.  Id. at 13-15.  Wisdom thus asks the Court to strike most sections of these Declarations before proceeding  with its analysis.  Id. at 15.

In making  this argument,  however,  Plaintiff  misconstrues  what Rule 56 mandates in the FOIA context.  A FOIA declarant may satisfy that rule's personal-knowledge  requirement  "'if in his declaration,  [he] attest[s] to his personal knowledge  of the procedures used in handling  [a FOIA] request and his familiarity  with the documents in question.'"  Madison Mech., Inc. v.

Nat'l Aeronautics & Space Admin., No. 99–2854, 2003 WL 1477014, at *6 (D.D.C. Mar. 20, 2003) (quoting Spannaus v. Dep't of Justice, 813 F.2d 1285, 1289 (4th Cir. 1987)); see also Barnard v. Dep't of Homeland Security, 531 F. Supp. 2d 131, 138 (D.D.C. 2008) ("Declarants are not required to participate in the search for records."). Hearsay is thus acceptable for FOIA affidavits. SafeCard, 926 F.2d at 1201; see also Carney v. Dep't of Justice, 19 F.3d 807, 814 (2d Cir. 1994) ("An affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from each individual who participated in the actual search.").

Carilli, in this case, attests that he is responsible "for agency compliance with [FOIA]" and has "direct involvement in the processing of responses to requests for access to [USTP] records and information." Carilli Decl., ¶¶ 1-2. He also explains that his statements "are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith." Id., ¶ 2. In others words, he has based his conclusions on information provided to him by other agency employees and his own review of agency records.

While the Carilli Declarations might have provided this necessary information in a more direct and clear manner – e.g., by using the tried-and-true recitation of a "familiarity with the documents in question" – the language he has used nonetheless presents a sufficient approximation to satisfy Rule 56's requirements here. The Court, accordingly, declines to strike these affidavits as deficient and may now proceed to consider whether the search procedures they describe were adequate.

C.  Search Adequacy

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  Valencia-Lucena v. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)); see also Steinberg v. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994).  The adequacy of an agency's search for documents under FOIA "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."  Weisberg v. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  "When a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant."  SafeCard, 926 F.2d at 1201.  To meet its burden, the agency may thus submit affidavits or declarations that explain the scope and method of its search "in reasonable detail."  Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982).  If the record, however, "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."  Truitt, 897 F.2d at 542.

For ease of reference, the Court takes up the adequacy of these searches – and Carilli's Declarations in support – in separate sections corresponding to the three request numbers.

1.  *2015-2053*

To remind the reader, the first request sought, from the Boise office, 15 categories of documents related either to Wisdom's bankruptcy or Gugino's service as a trustee. EOUST tasked the Assistant United States Trustee (AUST) for Region 18 with conducting a search for these documents.  See Carilli Decl., ¶ 24.  The AUST then identified seven employees in the Boise office likely to have "knowledge" of the records, including himself, trial attorneys and

paralegals assigned to Wisdom's bankruptcy case, and the bankruptcy analysts assigned to trustee oversight.  Id., ¶ 26.  These employees subsequently searched the Boise office's shared computer drive, the Region 18 shared computer drive, their own individual hard drives, and their personal hard drives stored on the local Boise server for the terms: "Gugino," "Wisdom," the relevant bankruptcy case numbers, and "blanket bond."  Id., ¶¶ 25-27.  An employee also manually searched a hard-copy trustee-oversight file, but did not search any hard copies of the bankruptcy case files, as those were no longer located in the Boise office.  Id., ¶ 27.  Any documents located in the search were then sent to EOUST for processing.  Id., ¶ 28.

While the Court understands this declaration to imply that the agency strove to be thorough in its efforts, the recounting of its search is facially flawed under this Circuit's caselaw. To satisfy the dictates of FOIA, Defendant must, at a minimum,  "aver that it has searched all files likely to contain relevant documents."  Am. Immigration Council v. Dep't of Homeland Sec., 21 F. Supp. 3d 60, 71 (D.D.C. 2014) (quoting Am. Immigration Council, 950 F. Supp. 2d at 230) (emphasis added).  As the D.C. Circuit explained in Oglesby, while an agency need not search every one of its record systems, a "reasonably detailed affidavit . . . averring that all files likely to contain responsive materials . . . were searched[] is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment."   920 F.2d at 68.

Where the government, as it has here, fails to make such an attestation, courts have typically found that an issue of material fact exists as to the adequacy of the search.  In Jefferson v. Bureau of Prisons, No. 05-848, 2006 WL 3208666 (D.D.C. Nov. 7, 2006), for example, the court found the FBI's search inadequate because its declaration did not "aver that the FBI searched all files likely to contain responsive records."  Id. at *6; see also Bonaparte v. Dep't of

Justice, 531 F. Supp. 2d 118, 122 (D.D.C. 2008) (same); Maydak v. Dep't of Justice, 362 F. Supp. 2d 316, 326 (D.D.C. 2005) (same).

Defendant, likewise, has failed to meet its burden here. In fact, USTP makes only vague averments that it assigned the official "responsible for the maintenance of all records held in the Boise, Idaho office" to spearhead its search, that he in turn identified "the search locations where the records may be located," and that his office maintained "both hard copy and electronic files of bankruptcy case files, system of records JUSTICE/UST-001 Bankruptcy Case Files and Associated Records and trustee oversight files, system of records JUSTICE/UST-002 Bankruptcy Trustee Oversight Records." Carilli Decl., ¶¶ 24-26. The agency never proceeds to declare that the AUST or other employees ultimately searched every hard copy and electronic system that might contain responsive documents. This attestation, as a result, simply does not pass muster. See Oglesby, 920 F.2d at 68 (finding search deficient notwithstanding agency's assertion that "a search was initiated of the Department record system most likely to contain the information which had been requested"); Am. Immigration Council, 21 F. Supp. 3d at 71 (deeming declaration inadequate despite agency's claim that it searched the offices "most likely to possess records responsive to [Plaintiff's] request").

In the absence of an affidavit containing the specific declaration that the agency searched all locations likely to contain responsive documents, the Court must conclude that a genuine issue of material fact remains as to whether the agency conducted an adequate search in regard to stage one of request 2015-2053.

2.   *2016-2003*

For largely the same reason, the agency also has not demonstrated that it adequately searched for documents related to Wisdom's second FOIA request, which, as a reminder, sought

documents pertaining to Defendant's earlier processing of 2015-2053. This time, Carilli explains only that "EOUST determined that the responsive records would be located in the" Boise office, that it assigned the same AUST to conduct the search, and that he determined that the same seven employees "had knowledge of the records requested." Carilli Decl., ¶¶ 44-46. He then summarily states that each of these employees "verified that the office did not have any records responsive to the request." Id., ¶ 46.

As should be clear, the agency must attest that it searched all of the places likely to contain documents pertaining to Wisdom's request. See Oglesby, 920 F.2d at 68. This time, however, the agency is also deficient in not describing the scope and method of its search in any sort of "reasonable detail." Perry, 684 F.2d at 127. Indeed, no mention at all is made of what these employees searched nor how they did so. USTP also fails to explain why it believed that responsive documents could not be found outside the Boise office, even though Wisdom specifically asked for communications between the Boise office and third parties. See Mot., Exh. V. It is logical to assume that, even if the Boise office did not maintain records of such communications, other departments in the agency that were party to the conversations might have done so. The record, moreover, contains no indication, as recounted above, that Wisdom ever abandoned his request for documents located outside Boise in regard to 2016-2003.

As a result, there remains a genuine issue of material fact as to the adequacy of this search, too.

### 3. *2016-2033*

To complete its final search for records responsive to Wisdom's 2015-2053 request, but this time in locations other than the Boise office, the agency followed a similar path to that described above. It first "determined that the responsive records may be located in the" Region

18 Office and EOUST Office of Oversight.  See ECF No. 24-1 (Supplemental Carilli

Declaration), ¶ 15.  For the documents located in the Region 18 Office, the local official in charge

of coordinating the oversight of the panel trustees "determined that any responsive documents

held [in that office] would be duplicative of the documents provided in response to EOUST FOIA

2015-2053" from the Boise office.  Id., ¶ 16.  The agency thus describes no search at all that took

place of records in this office.  While there may be some cases where no search is necessary

because any such effort would clearly be duplicative, the agency never explains in sufficient

detail why that would be so in this instance.  Suffice it to say, then, that no search of this office at

all was plainly not an adequate search here.

　　　USTP did, however, at least conduct a search of its Office of Oversight.  But, again,

Carilli merely lists a variety of hard-copy and electronic resources maintained by EOUST.  See

Suppl. Carilli Decl., ¶ 18.  He then states that, after reviewing the request, the official in charge of

such records "identified the search locations where the records may be located" as an office

shared drive, user home drives, and the hard-copy trustee-oversight files.  Id., ¶¶ 18-19.  This

official then conducted a "search" of these locations and sent the responsive documents to

EOUST officials for processing.  Id., ¶¶ 20-21.

　　　As should be obvious by now, this final search thus again fails to describe with

"reasonable detail" an effort this Court could determine "was reasonably calculated to discover

the requested documents."  SafeCard, 926 F.2d at 1201.  Not only does the agency's declaration

not assert that its methods might have been expected to turn up all relevant documents, it also

never details any search terms or methods that were used in regard to either office that was

searched.  In fact, it appears that no search for any responsive documents even occurred at the

Region 18 Office, which the agency itself had determined should possess such records.

\*    \*    \*

To sum up, the Court concludes that, for the first two FOIA requests at issue in this case, a genuine issue of material fact exists as to whether the agency's search for responsive documents was adequate. While the government's Motion as to the search fails because it has not properly described its searches, Plaintiff's summary-judgment Motion as to the search likewise falls short, as it remains unclear whether the searches themselves were inadequate or just inadequately explained by the government. USTP, accordingly, must either supply a sufficient declaration or conduct a new search. As to the final 2016-2033 request, the Court concludes, based on the agency's own representations, that its search was inadequate and that Wisdom is thus entitled to summary judgement on this limited score. In other words, EOUST must renew its search as to these last records.

     D. <u>Exemptions</u>

Next up are the numerous redactions made by the agency and the FOIA exemptions it cited in justification – primarily Exemptions 5, 6, and 7(E). The Court takes up each in turn below.

Before doing so, however, it bears noting that Plaintiff spends a good deal of time in his Cross-Motion and Reply discussing various exemptions that the agency either did not rely on or that he ultimately concludes he is not interested in challenging. <u>See, e.g.</u>, Cross-Mot. at 23 (after discussing Exemption 7(C), recognizing "Exemption 7(C) is not at issue here"). In particular, he expressly waives any challenge to the agency's reliance on Exemption 6 to redact direct-dial telephone numbers for its employees and on Exemption 3 for redactions of various tax-return documents. <u>Id.</u> at 25. As a result, the Court will not examine those particular withholdings.

1.   *Exemption 5*

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).   In other words, under Exemption 5, an agency may withhold from a FOIA requestor any "documents[] normally privileged in the civil discovery context."   NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984).   This exemption thus encompasses three distinct categories of information: deliberative-process privilege, attorney-work-product privilege, and attorney-client privilege. See Am. Immigration Council v. Dep't of Homeland Sec., 905 F. Supp. 2d 206, 216 (D.D.C. 2012).   USTP here relies only on the first two, which the Court will, yet again, address in turn.

a.   Deliberative-Process Privilege

The deliberative-process privilege shields internal agency "advisory opinions, recommendations and deliberations" in order to "protect[ ] the decision making processes of government agencies."   Sears, Roebuck & Co., 421 U.S. at 150 (citations omitted).   To qualify under this privilege, a record must meet two requirements.   First, it must be predecisional – *i.e.*, "antecedent to the adoption of an agency policy."   Jordan v. Dep't of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978) (*en banc*) (emphasis omitted), overruled in part on other grounds, Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1053 (D.C. Cir. 1981) (*en banc*).   Even when an agency subsequently makes a final decision on the issue discussed in the record, the record remains predecisional if it was produced before that final decision.   See Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill, 443 U.S. 340, 360 (1979).   Second, a record must be deliberative – *i.e.*, "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters."   Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C.

Cir. 1975). "A document that does nothing more than explain an existing policy cannot be considered deliberative." Public Citizen, Inc. v. OMB, 598 F.3d 865, 876 (D.C. Cir. 2010).

Based on these distinctions, "Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." Sears, Roebuck & Co., 421 U.S. at 153 (citation and internal quotations marks omitted). A "strong theme" of this Circuit's decisions on the deliberative-process privilege, moreover, "has been that an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'" Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 867 (D.C. Cir. 1980). In other words, an agency may not cast records as predecisional when they actually convey what the agency's policymakers have decided. See id. at 868 (explaining "a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made").

Citing this privilege, EOUST defends its withholding of two types of intra-agency records here. As to the first category – which contained information about how Gugino should be evaluated as a trustee – the agency explains only that it determined these documents would "dampen the ability of the [agency]'s employees to have open and frank discussions internally and with the trustee regarding trustee performance." Carilli Decl., ¶ 30. The agency does not explain how these documents were "predecisional" or, in fact, whether they were deliberative in

the sense of being designed to work toward the crafting of an agency policy or action.  Nor does Defendant cite to whom or from whom these documents were sent.

Based on this scant information alone and bearing in mind "the strong policy of the FOIA that the public is entitled to know what its government is doing and why," the Court cannot say that these redactions were proper.  Coastal States Gas, 617 F.2d at 868; see also Mead Data Cent., Inc. v. Dep't of Air Force, 566 F.2d 242, 258 (D.C. Cir. 1977) ("An agency cannot meet its statutory burden of justification [under Exemption 5] by conclusory allegations of possible harm.").  If, for example, the redacted information merely summarizes the relevant facts or agency policies used to evaluate trustees, the privilege would not likely be justifiable here.  See, e.g., Public Citizen, 598 F.3d at 876 ("[A]gencies must disclose those portions of predecisional and deliberative documents that contain factual information that does not inevitably reveal the government's deliberations.") (citation and internal quotation marks omitted).  Indeed, at least one of the withheld pages, which Plaintiff has provided, appears to be a performance review of Gugino.  See Cross-Mot., Exh. J at 9.  Several courts have found that such reviews are not deliberative, though they may be predecisional, and thus not subject to the deliberative-process privilege.  See, e.g., McGrady v. Mabus, 635 F. Supp. 2d 6, 18-19 (D.D.C. 2009); see also Cowdery, Ecker & Murphy, LLC v. Dep't of Interior, 511 F. Supp. 2d 215, 218-20 (D. Conn. 2007).  The agency provides no reason here to think its evaluation is somehow different.  As a result, it has not met its burden to justify these withholdings.

The agency's defense of its second set of deliberative-process redactions fares little better.  This time, the agency states vaguely that the withheld documents contain discussions about how the Trustee should handle complaints being made by the public about Gugino's demeanor.  See Carilli Decl., ¶ 29.  Again, no mention is made about to whom or from whom the

26

documents were sent. Id. No further description, in fact, is provided except this brief statement. Should the documents direct a formal agency policy from a supervisor to an inferior about what should be done to respond to these complaints, the privilege would not likely shield the records from disclosure. Public Citizen, 598 F.3d at 876 ("Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld."). The Court here again simply lacks a sufficient description of these documents to rule out such a possibility. While at least some of the redacted documents provided by Wisdom appear to contain the requisite sort of back-and-forth characteristic of agency deliberations, see, e.g., Wisdom Decl., Exh. C at 49-51, without knowing the identity of the authors, the Court cannot so assume.

The agency, moreover, wholly fails to discuss in its declarations another page that it describes in its Vaughn Index – an index provided by the agency that catalogues all of the records released and the cited exemptions – as being redacted pursuant to Exemption 5 and containing "information . . . regarding the status of the relationship between panel trustees and bankruptcy judges." Mot., Exh. X at 1 (referring to p.17); see also Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973) (describing use of index to itemize and describe FOIA records during litigation). There is no reason to believe, based on this description alone, that these documents would be entitled to withholding under the deliberative-process exemption. The same is true of another set of redactions that the agency describes – again, only in its Vaughn Index – as pertaining to communications about the "trustee's field exam." See, e.g., Mot., Exh. Z at 2 (referring to pp. 28-38, 41-44). If anything, these documents seem to be either purely descriptive of policy or otherwise factual in nature, and not related to any particular agency-deliberative process.

The Court thus holds that Defendant has not demonstrated at this stage that it can withhold any of the documents for which it cited Exemption 5's deliberative-process privilege.

### b.  Attorney-Work-Product Privilege

"The attorney work-product [prong of Exemption 5] protects 'documents and tangible things that are prepared in anticipation of litigation or for trial' by an attorney." Am. Immigration Council v. DHS, 905 F. Supp. 2d 206, 221 (D.D.C. 2012) (quoting Fed. R. Civ. P. 26(b)(3)). As this Court has noted in the past, the work-product privilege is relatively broad, encompassing documents prepared for litigation that is "foreseeable" even if not necessarily imminent. Id. The privilege, however, is not boundless. No doubt potential "future litigation touches virtually any object of a[n agency] attorney's attention," but "if the agency were allowed 'to withhold any document prepared by any person in the Government with a law degree simply because litigation might someday occur, the policies of the FOIA would largely be defeated.'" Senate of Puerto Rico v. Dep't of Justice, 823 F.2d 574, 586-87 (D.C. Cir. 1987) (quoting Coastal States Gas, 617 F.2d at 865).

When reviewing a withholding under the work-product privilege, the D.C. Circuit employs a because-of test, inquiring "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." FTC v. Boehringer Ingelheim Pharms. Inc., 778 F.3d 142, 149 (D.C. Cir. 2015) (quoting United States v. Deloitte LLP, 610 F.3d 129, 137 (D.C. Cir. 2010)). Where a document would have been created "in substantially similar form" regardless of the litigation, work-product protection is not available. See Deloitte, 610 F.3d at 138 (quoting United States v. Adlman, 134 F.3d 1194, 1195 (2d Cir. 1998)). This means that USTP here must at least demonstrate that the lawyer who prepared these documents possessed

the "subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998). For the government to discharge its evidentiary burden under this test, it generally must provide a description of the contents of the withheld document – which typically includes the document's author and the circumstances surrounding its creation – and provide some indication of the type of litigation for which the document's use is at least foreseeable. See Ellis v. Dep't of Justice, 110 F. Supp. 3d 99, 108 (D.D.C. 2015).

Defendant here redacted documents that it claims were "prepared by an attorney or at the direction of an attorney in connection with a possible administrative action against the Trustee" under 28 C.F.R. § 58.6 or during litigation in a bankruptcy case. See Carilli Decl, ¶¶ 29-30; Suppl. Carilli Decl., ¶¶ 22-23. Full stop. The agency says nothing more about who prepared the documents or what content they contain. Id. Nor does it clarify against whom it thought such litigation might occur or on what basis, though one might guess that it is referring to Gugino as the "Trustee" and, possibly, to Wisdom's bankruptcy case. Id. The agency thus has failed to meet its burden to justify any of these redactions through an adequately descriptive affidavit. See Ellis, 110 F. Supp. 3d at 108.

While USTP seeks in its brief to supplement this sparse description, such further elaboration is insufficient at the summary-judgment stage to meet the government's evidentiary burden. Military Audit Project, 656 F.2d at 738. These additional facts, likewise, would only reiterate that the records might have been prepared by an attorney in anticipation of a possible administrative proceeding to remove a trustee (again, Gugino is not mentioned by name) based on complaints about his demeanor. See Mot. at 23-24. The agency makes no further mention

about who might have prepared the documents (or her position), nor does it provide any further description of their content. Id.

A sampling of the documents provided by Wisdom also reveals that at least some of the redactions made on this ground by the agency appear to be improper. For example, EOUST cited this exemption to justify redactions contained in a field report of Gugino that was conducted by a bankruptcy analyst for the apparently routine purpose of evaluating his general performance. See Wisdom Decl., Exh. C at 28-38. In another instance, the agency redacted an entire page of comments that appear to be observations written down by the Assistant United States Trustee (AUST) who was observing Gugino in court on April 22, 2013. Id. at 52. The Court cannot ascertain at this point how such routine audits of workplace performance could be considered as produced at the behest of an attorney in preparation of litigation. Put simply, these are not the sort of documents that would ordinarily be protected by the privilege.

The Court, consequently, must conclude that a genuine issue of material fact remains as to whether the government properly withheld any records under Exemption 5's attorney-work-product privilege.

### 2. *Exemption 6*

Plaintiff next argues that Defendant improperly redacted three other categories of information under Exemption 6. See Cross-Mot. at 25. To qualify for this exemption, the agency must show that the following criteria are met: first, the information must be contained within "personnel and medical files and similar files"; second, the disclosure of the information "must constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); see also Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review, 830 F.3d 667, 673 (D.C. Cir. 2016). A court thus "generally follow[s] a two-step process when considering

withholdings or redactions under Exemption 6." <u>Am. Immigration Lawyers</u>, 830 F.3d at 673. It must first "determine whether the [records] are personnel, medical or 'similar' files covered by Exemption 6." <u>Id.</u> (quoting <u>Multi Ag Media LLC v. Dep't of Agric.</u>, 515 F.3d 1224, 1228 (D.C. Cir. 2008)). Then, if "the records are covered by the exemption, [the court must] determine whether their disclosure would constitute a clearly unwarranted invasion of personal privacy." <u>Id.</u> Within this latter step, as well, there is another "another two-step process." <u>Id.</u> (internal quotation marks omitted). This time, the Court must first determine that "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." <u>Id.</u> at 674 (quoting <u>Nat'l Ass'n of Home Builders v. Norton</u>, 309 F.3d 26, 33 (D.C. Cir. 2002)). If it does, the Court then "weigh[s] the privacy interest at stake 'against the public interest in the release of the records.'" <u>Id.</u>

Each of the three categories of information for which the government relied on this exemption – names and personal information of various individuals, Gugino's trustee evaluations, and other trustees' performance reviews – are discussed separately using this formula.

### a.   Names and Personal Information

The first bundle of Exemption 6 redactions consists of the names of individuals who complained to the agency about Gugino's demeanor, various names of debtors who appear in those complaints, and similar identifying information contained in other documents produced by Gugino about related bankruptcy negotiations with these private citizens. <u>See</u> Mot. at 25, Exhs. X, Y, Z (2015-2053 <u>Vaughn</u> Indices); Opp., Exh. K (2016-2033 <u>Vaughn</u> Index). With scant explanation, Wisdom claims that none of this information was properly withheld by the agency under this exemption, but, at each step of the multi-pronged analysis, his argument falls flat.

Starting at step one, Wisdom maintains that these records do not satisfy the Exemption 6 test as they are not found in "personnel or medical files." But, in making this statement, he seems to overlook the fact that this exemption also covers files and information "similar" to personnel records. See 5 U.S.C. § 552(b)(6). Relying on this language, courts have routinely held that government files consisting of private pieces of information similar to what might be contained in a personnel file sufficiently fit the "similar files" bill, including the type of names and bank-account numbers that the government withheld here. Judicial Watch, Inc. v. FDA, 449 F.3d 141, 152-53 (D.C. Cir. 2006) ("We have also read the statute to exempt not just files, but also bits of personal information, such as names and addresses, the release of which would 'create[] a palpable threat to privacy.'") (quoting Carter v. Dep't of Commerce, 830 F.2d 388, 391 (D.C. Cir. 1987)); see Am. Immigration Lawyers, 830 F.3d at 673 (concluding names of complainants who filed against immigration judges were protected); see also Dep't of Def. v. FLRA, 510 U.S. 487, 495-96 (1994) (holding Exemption 6's purpose "not fostered by the disclosure of information about private citizens that is accumulated in various government files but that reveals little or nothing about an agency's own conduct") (quoting Reporters Comm., 489 U.S. at 775). The Court thus concludes that the first prong is satisfied.

It next considers whether the individual complainants and debtors have a substantial privacy interest in the withholding of their identities. According to Wisdom, they do not, as any such interest was "extinguished with the filing" of their complaints or bankruptcy proceedings. See Cross-Mot. at 24-25. In essence, he seems to believe that because the information on who is going through bankruptcy proceedings is publicly available elsewhere, the complainants and debtors have no further privacy interest in the withholding of their names or personal information in the context of these complaints or catalogues of their disagreements with Gugino. Id.

This is incorrect.  As the D.C. Circuit has indicated,  even where such identifying information  is otherwise available in public records, individuals  may still retain a privacy interest in avoiding  the association of their names with complaints  or other disciplinary  actions.  See Am. Immigration  Lawyers, 830 F.3d at 674; see also Dep't of State v. Wash. Post Co., 456 U.S. 595, 600 (1982) ("Information  such as place of birth, date of birth, date of marriage, employment history,  and comparable data is not normally  regarded as highly  personal, and yet . . . such information  . . . would be exempt from any disclosure  that would  constitute  a clearly unwarranted invasion  of personal privacy.").  The second prong of the Exemption  6 analysis, as a result, is clearly satisfied  with regard to these names.  The debtors who privately  made these complaints  about Gugino to the agency may very well wish to remain indistinguishable  from the other debtors for whom Gugino  served as a private trustee during the same timeframe.  This is particularly  so because the substance of their complaints  and conflicts  with him have already been released in what the agency did disclose,  many records of which contain very personal details about their disagreements  with the trustee and other personal hardships.  The same is true of the other names redacted – for instance, in documents  that Gugino  prepared to defend himself against their accusations.  See, e.g., Cross Mot., Exh. A (First 2015-2053  Release) at 56-57. Regardless of what information  these individuals  may have been forced to make public in their bankruptcy proceedings,  they maintain  a continued  privacy interest in staying unconnected  to these particular records.

The court must still, of course, proceed to the final step of its analysis as "[t]he statute does not categorically  exempt individuals'  identities" given that "the 'privacy interest at stake may vary depending on the context in which it is asserted.'"  Judicial Watch, 449 F.3d at 153 (quoting  Armstrong v. Exec. Office of the President, 97 F.3d 575, 582 (D.C. Cir. 1996)).  To

determine whether the agency "appropriately withheld these names" here, the Court must "'balance the private interest involved . . . against the public interest . . . [in] open[ing] agency action to the light of public scrutiny.'"  Id. (internal quotation marks omitted) (quoting Horowitz v. Peace Corps, 428 F.3d 271, 278 (D.C. Cir. 2005)).

On this final score, the government convincingly argues that the release of these records' substance fully satisfies the public interest in them, and no other gain could be had by the further disclosure of these individual names or related personal data.  See Mot. at 25-27.  As it notes, the exposure of this identifying information could subject the individuals involved to "unnecessary public attention, harassment, or embarrassment" and stymie the government's efforts to obtain candid information about the performance of its trustees from such parties in the future.  See Carilli Decl., ¶ 33.  Indeed, courts have routinely upheld the withholding of complainants' names on similar rationales.  See, e.g., Lakin Law Firm, P.C. v. FTC, 352 F.3d 1122, 1125 (7th Cir. 2003).

Wisdom also fails, for his part, to identify any public interest that might be furthered by the release of these names.  See Carter, 830 F.2d at 390 n.8, 391 n.13 (explaining requestor bears burden of identifying public interest in disclosure).  He postulates vaguely that identification of these individuals might contribute to the public's understanding of the operations or activities of the government, but never explains why the identification of the particular private citizens involved in these events would do so.  See Cross-Mot. at 24-25.  He also contends that the government's withholding of the names is intended to "shield Gugino from embarrassment" and to cover up the agency's "lax oversight" of the trustee's performance, see id. at 25, but, again, the Court is at a loss as to how the withholding of these names themselves might further aid such purported nefarious objectives on the agency's part, given that it has already released the

substance of the underlying complaints. A review of the documents at issue, in fact, confirms that, for this particular category of data, the agency carefully extracted just the identifying names and personal information of these individuals, but otherwise left intact the entirety of the records' documentation of Gugino's actions as a trustee. See id., Exh. A (First 2015-2053 Release), Exh. B (Second 2015-2053 Release), Exh. C (Third 2015-2053 Release).

As a result, the Court will grant Defendant partial summary judgment as to the withholding of these names and personal data.

### b.   Gugino's Performance Evaluations

The second category of Exemption 6 redactions made by USTP involved either Gugino's performance reviews or files prepared for the purpose of evaluating his work as a trustee, most notably his field examinations. See Mot. at 27-29. Wisdom protests that these records did not meet any of the requirements for withholding under this exemption. As before, he is largely incorrect. This time around, though, he has shown that there is a credible argument that the public interest in at least some of this information might outweigh the privacy interests at stake, and the Court will thus order the government to produce these documents for review in camera.

The first two steps of the Exemption 6 analysis are again relatively straightforward. Although Wisdom claims that these are not personnel files because Gugino is not a government employee, the discussion above makes clear that this distinction does not matter since the information redacted is still of the type protected in "similar files." Rose, 425 U.S. at 377 (describing "evaluations of his work performance" as "the kind of profile of an individual ordinarily to be found in his personnel file"); Smith v. Dep't of Labor, 798 F. Supp. 2d 274, 284 (D.D.C. 2011) (holding "[p]erformance appraisals are precisely the sort of information found in protected personnel files"). Prong one is thus satisfied.

As to prong two, a person has a substantial privacy interest in a supervisor's candid evaluation of his performance. See Ripskis v. HUD, 746 F.2d 1, 3 (D.C. Cir. 1984) (holding individuals have substantial privacy interest in performance evaluations); see also FLRA v. Dep't of Commerce, 962 F.2d 1055, 1059-61 (D.C. Cir. 1992) (affirming withholding of employee performance appraisals as "intensely personal"); Barvick v. Cisneros, 941 F. Supp. 1015, 1020-21 (D. Kan. 1996) (finding privacy interest in personal information such as home addresses and telephone numbers, social-security numbers, and performance appraisals). Although Wisdom argues that Gugino is a mere service provider, rather than a government employee, this is neither here nor there. The fact is that these records contain evaluations of his work performance by his supervisor, which were created and held by the government. See Celmins v. Dep't of Treasury, 457 F. Supp. 13, 15 (D.D.C. 1977) ("[E]valuation of an individual's work performance, even if favorable, is personal information."). There can be little doubt given the number of complaints about Gugino's demeanor, moreover, that many of the records might contain information that would be personally embarrassing to him.

Having found that Defendant has satisfied the first two Exemption 6 requirements, the Court must now weigh the public interest in disclosure against this recognized privacy interest. The only valid public interest, in this FOIA context, is one that serves the statute's core purpose of shedding light on an agency's performance of its statutory duties. See Reporters Comm., 489 U.S. at 773. A requester can generally satisfy his burden to demonstrate such an interest where he can show that disclosure would serve to "check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978).

In this case, Wisdom makes a substantial argument that Gugino's performance evaluations could at least marginally advance the public interest in shedding light on some form

of misconduct by a trustee and the government's response thereto. As the information turned over in several of the other records reveals here, multiple individuals and attorneys complained to USTP about Gugino's dismissive and demeaning behavior toward debtors and other professionals with whom he worked during his time as a trustee. Wisdom is also surely correct that Gugino, as a trustee, wielded an enormous amount of official power over certain citizens, and, should that authority have been abused, the public has a clear interest in knowing how the government responded – to investigate and, if substantiated, to squelch such behavior. Presumably, at least some of these evaluations thus would contain further information shedding light on how the government reacted to potential abuse-of-power accusations lodged against a person holding significant government authority. In light of evidence of potential wrongdoing by high-ranking government officials, moreover, some courts have required the release of performance evaluations despite the privacy interests at stake, as the agency here readily concedes. See, e.g., Cowdery, Ecker & Murphy, LLC v. Dep't of the Interior, 511 F. Supp. 2d 215, 217-20 (D. Conn. 2007).

On the other side of the ledger, there is no evidence at this point, despite Wisdom's claims to the contrary, of widespread abuses by any other private trustees or, indeed, serious abuses of his authority by Gugino in particular. The complaints against Gugino focus on his potentially surly, unprofessional, and combative interpersonal style, as well as an occasional misstep in the dispensation of his duties. It is also likely the case that, as the government further contends, the disclosure of his evaluations will dampen the ability of supervisors to candidly evaluate other trustees' performance and, as a result, somewhat inhibit the ability of the government to effectively supervise them. Finally, the urgency to uncover these records is somewhat diminished by the fact that Gugino has resigned from his post. See Carilli Decl., ¶ 34.

Given the legitimate arguments both in favor of and against disclosure of at least some of the information contained in these documents, the Court will review these particular records *in camera* to resolve the competing interests. Until such resolution, there remains a genuine issue of material fact as to whether Exemption 6 justifies their non-disclosure.

### c.   Other Trustee Performance Evaluations

The same cannot be said about the performance evaluations of <u>other</u> trustees, which USTP also withheld on the same ground as Gugino's reviews. These documents, for the reasons already listed, plainly meet the first and second prongs of the Exemption 6 analysis. Absent any evidence of widespread wrongdoing by these trustees, though, Wisdom has failed to identify any potential public interest in their disclosure. The Court thus concludes that USTP has sufficiently met its burden with regard to withholding these documents and, accordingly, grants Defendant partial summary judgment on this claim.

*   *   *

To recapitulate, the Court holds that the government is entitled to partial summary judgment as to its Exemption 6 redactions of personal identifying information and trustee performance evaluations, except for Gugino's, which the Court will order the government to produce for *in camera* review.

### 3.   *Exemption 7(E)*

And then there was one. Citing Exemption 7(E), USTP redacted two pieces of information from the records that it turned over to Wisdom. <u>See</u> Mot., Exhs. Y & Z. Exemption 7 authorizes the government to withhold "records or information compiled for law-enforcement purposes, but only to the extent that the production of such law enforcement records or information" meets one of six requirements. <u>See</u> 5 U.S.C. § 552(b)(7); <u>see also</u> <u>Keys v. Dep't of</u>

38

Justice, 830 F.2d 337, 340 (D.C. Cir. 1987) ("[Exemption 7] exempts such documents from disclosure only to the extent that production of the information might be expected to produce one of six specified harms."). The fifth category – 7(E) – permits withholding if production "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). In order to properly invoke Exemption 7(E), then, the agency must satisfy two requirements: First, the record or information must be compiled for law-enforcement purposes; and second, production must disclose either techniques and procedures for law-enforcement investigations, or guidelines for law-enforcement investigations, that would risk circumvention of the law. Blackwell v. FBI, 646 F.3d 37, 40, 42 (D.C. Cir. 2011).

Defendant contends that the information it redacted in this case satisfies these requirements because it involves USTP's statutory duty to alert the appropriate United States Attorney to "any occurrence that might be criminal in nature." Mot. at 29-30 (citing 28 U.S.C. § 586(a)(3)(F)). According to the Carilli Declaration, the government made over 2,000 such referrals in 2015 alone, and the information that it redacted would reveal its techniques and procedures for detecting such illegal activity. See Carilli Decl., ¶ 37. Should the information that "suggests or forms the basis for identifying suspected fraud or abuse within or relating to bankruptcy" be made public, the government fears that bankruptcy filers would then be able to modify their activities to avoid detection and circumvent these laws. Id.

Wisdom, for his part, protests only that Defendant "has made no showing that the application of Exemption 7(E) would risk a 'circumvention of law'" or would disclose any "'techniques or procedures for law enforcement investigations or prosecutions.'" Cross-Mot. at

28. The Court, after reviewing the redacted documents attached as an exhibit to his Cross-

Motion, disagrees. <u>See</u> Second 2015-2053 Release at 2-3; Third 2015-2053 Release at 150-51.

As to the first redaction, it appears to contain only a single line or two of information about a

potential criminal concern related to one of Wisdom's own holdings, which Gugino appears to

have referred to an AUST for investigation. <u>See</u> Second 2015-2053 Release at 2-3. The second

of the redacted emails likewise seems to discuss a referral of a certain application fee to an

AUSA or AUST for investigation, though the amount of the fee has been redacted. <u>See</u> Third

2015-2053 Release at 150-51. Both of the redactions thus implicate the agency's procedures for

identifying fraud and, if revealed, would help debtors avoid the sort of conduct that the agency

looks for in flagging potential criminal acts. Given the "relatively low bar" required to make this

showing, moreover, the Court concludes that the agency has "'demonstrate[d] logically how the

release of the requested information might create a risk of circumvention of the law.'"

<u>Blackwell</u>, 646 F.3d at 42 (quoting <u>Mayer Brown LLP v. UPS</u>, 562 F.3d 1190, 1193 (D.C. Cir.

2009)). It need do no more with regard to this prong of the analysis. <u>Id.</u>

The problem with the government's representations here, instead, goes to the first

requirement of Exemption 7 – <i>i.e.</i>, that the records or information withheld be compiled for law-

enforcement purposes. <u>Summers v. Dep't of Justice</u>, 140 F.3d 1077, 1083 (D.C. Cir. 1998) ("At

the very threshold of section 7 exemption, the government must show that the withheld material

consists of "'records or information compiled for law enforcement purposes.'"). On this score,

USTP makes no showing at all. While one set of documents appears to meet this standard – as it

is a referral to a government attorney for investigation, <u>see</u> Third 2015-2053 Release at 150-51 –

the other appears to be contained in Gugino's emailed defense of himself in regard to a

complaint made against him by the public. <u>See</u> Second 2015-2053 Release at 2-3. At least as to

the latter, there seems to be no law-enforcement purpose undergirding the government's compilation or retention of the information, or none that Defendant has yet identified.

The Court thus finds that the government has failed to meet its burden for summary judgment as to Exemption 7(E) as well.

E.  Segregability

In the home stretch, Plaintiff argues, in rather cursory fashion, that Defendant failed to properly separate out information that could be disclosed from that which it lawfully withheld under the exemptions described above.

FOIA, indeed, requires that any such "reasonably segregable portion of a record shall be provided to any person requesting such record after the deletion of the portions which are exempt." 5 U.S.C. § 552(b).  While the Government is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material," Hodge v. FBI, 703 F.3d 575, 582 (D.C. Cir. 2013) (quoting Sussman v. U.S. Marshals Service, 494 F.3d 1106, 1117 (D.C. Cir. 2007)), this presumption of compliance does not obviate its obligation to carry its evidentiary burden and fully explain its decisions on segregability.  See Mead Data Cent., Inc. v. Dep't of Air Force, 566 F.2d 242, 261-62 (D.C. Cir. 1977).  To do so, the agency must provide "a 'detailed justification' and not just 'conclusory statements' to demonstrate that all reasonably segregable information has been released." Valfells v. CIA, 717 F. Supp. 2d 110, 120 (D.D.C. 2010); see also Armstrong, 97 F.3d at 578 (determining government affidavits explained nonsegregability of documents with "reasonable specificity").  "Reasonable specificity" can be established through a "combination of the Vaughn index and [agency] affidavits." Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002).

The Court need only consider at this stage whether the government has met this burden in relation to those records upon which it has been granted partial summary judgment above, as the agency will need to review and justify its work with regard to its other withholdings in a new round of briefing. Looking only to those Exemption 6 redactions, then, the Court finds that the agency has indeed met its segregability obligations under FOIA. As detailed in the Carilli Declarations and the accompanying <u>Vaughn</u> Indices itemizing each redaction made to the personal data and trustee performance evaluations (except Gugino's), the agency has shown that it went line-by-line to determine whether any of the information contained therein was subject to the cited exemption. <u>See</u> Carilli Decl., ¶¶ 39, 47-48; Suppl. Carilli Decl., ¶ 29, 31-32. For any portion that was redacted, moreover, the agency has provided a specific claimed exemption detailing the information withheld and the reason that it felt such a redaction was justified under the statute. <u>See</u> 2015-2053 <u>Vaughn</u> Indices; 2016-2033 <u>Vaughn</u> Index. In each case, the information redacted is either minimal, such as a name, or wholly within the protection of the applicable exemption, such as a part of the performance evaluation.

Defendant is thus entitled to partial summary judgment on this issue to the extent that it implicates the aforementioned records. The Court may, however, examine a renewed segregability claim by Wisdom as to the other documents at issue once the agency has reviewed its withholdings and provided further justification for those redactions.

## IV.   Conclusion

For the reasons stated above, the Court will issue a contemporaneous Order granting partial summary judgment to Defendant, pursuant to Exemption 6, as to the withholdings that it made of personal information for various complainants and debtors, as well as to the performance evaluations of trustees other than Gugino. The Court will also grant partial

summary judgment to Wisdom as to the search related to inquiry 2016-2033, meaning Defendant must conduct a new search. A genuine issue of material fact otherwise exists as to the adequacy of the other searches the government conducted, so USTP will either have to explain them in more detail or renew the search process. Similarly, the government must offer further detail to support its cited exemptions or turn over more material. The Court will also require that the agency produce Gugino's performance evaluations for *in camera* review.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: January 13, 2017